**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| WINE & CANVAS DEVELOPMENT LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:11-cv-01598-TWP-DKL |
| | ) | |
| THEODORE WEISSER, | ) | |
| YN CANVAS CA, LLC, and | ) | |
| WEISSER MANAGEMENT GROUP, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**FOLLOWING THE MARCH 2, 2015 DAMAGES HEARING**

This matter is before the Court for a decision on damages sought by Plaintiff Wine &
Canvas Development LLC ("WNC") against Defaulted Defendants Theodore Weisser
("Weisser"), YN Canvas CA, LLC ("YN Canvas"), and Weisser Management Group, LLC
("Weisser Management") (collectively "Defaulted Defendants"). WNC's Amended Complaint
alleged violations of the Lanham Act for trademark infringement and other violations, and
requested Injunctive Relief and Damages. Following an entry of default, a hearing was held on
March 2, 2015, wherein the parties were permitted to present evidence, make argument and submit
proposed findings of fact and conclusions of law. The Court now finds as follows:

**I.    BACKGROUND**

Although the procedural and factual backgrounds pertaining to this action have been set
forth in previous orders, a summary in this Entry is warranted. The complaint in this matter was
filed in state court in November 2011, and the action was removed to federal court on December
2, 2011. WNC filed an Amended Complaint on September 4, 2012 (Filing No. 36) against Weisser,
Christopher Muylle ("Muylle"), YN Canvas and Weisser Management. WNC's Amended

Complaint asserts the following claims: Count 1 - Trademark Infringement; Count 2 - False Designation of Origin; Count 3 - Trademark Dilution; Count 4 - Sales of Counterfeit Items; Count 5 - Unfair Competition; Count 6 - Bad Faith, Tortious Conduct, Abuse of Process, et al.; Count 7 - Civil Action Under the Indiana Crime Victims Act; Count 8 - Breach/Equitable Relief; and Count 9 - Fraud.

Initially, Weisser was represented by counsel, however, his attorneys withdrew their appearance on October 4, 2012, and the Court directed the Clerk to add Weisser as a *pro se* litigant (Filing No. 48). On October 22, 2012, Weisser filed an Answer to the Amended Complaint and asserted counterclaims against WNC for violation of California's franchise code and for cancellation of the WNC trademark registration (Filing No. 51). Thereafter, Weisser virtually abandoned this case. Throughout his self-representation, Weisser disregarded many court orders and procedures, and missed numerous deadlines.

In January 2013, Weisser's Co-Defendant, Christopher Muylle, filed an Amended Answer and asserted counterclaims against WNC and third party claims against Anthony Scott ("Scott"), Tamara McCracken ("Ms. McCracken"), and Donald McCracken ("Mr. McCracken") (Filing No. 66). The counterclaims and third party claims were two counts of violations of California's franchise code, cancellation of the WNC trademark registration, and abuse of process. WNC then filed third party counterclaims against Muylle, Weisser, YN Canvas, and Weisser Management on June 18, 2013 (Filing No. 101).

In September 2013, the Court granted WNC's motions to dismiss Muylle's two counts of violations of California's franchise code as well as Weisser's counterclaim for violation of California's franchise code (Filing No. 144; Filing No. 145 (adopted by Filing No. 179 and Filing No. 184)). On November 22, 2013, a Clerk's Entry of Default was entered against Weisser, YN

Canvas, and Weisser Management in their capacity as third party counterclaim defendants and against YN Canvas and Weisser Management in their capacity as defendants for their failure to file responsive pleadings (Filing No. 210).

Then on August 15, 2014, in two separate Orders on summary judgment motions, the Court dismissed Muylle's and Weisser's claims to cancel the WNC trademark registration (Filing No. 341; Filing No. 342). In the summary judgment Order as to Muylle, the Court also dismissed all of the claims asserted by WNC against Muylle with the exception of the trademark infringement claim and the false designation of origin claim after November 18, 2011. Muylle's claim for abuse of process against WNC, Scott, Ms. McCracken, and Mr. McCracken also survived summary judgment (Filing No. 341).

The final pretrial conference was held on October 22, 2014, and Weisser chose not to participate. On November 10, 2014, one week prior to the jury trial of this matter, the Court found Weisser in default as to liability for the claims asserted against him in WNC's Amended Complaint because of his failure to participate in the litigation and to comply with numerous court orders (Filing No. 408).

As a result of the Entries of Default and Orders on the Motions to Dismiss and Motions for Summary Judgment, the only claims remaining for trial were WNC's trademark infringement claim and false designation of origin claim against Muylle after November 18, 2011, and Muylle's counterclaim for abuse of process against WNC, Scott, Ms. McCracken, and Mr. McCracken. The Court informed the parties that a separate hearing after the trial would be held to determine damages as to the Defaulted Defendants (Filing No. 411).

From November 17 through November 20, 2014, the Court conducted a jury trial on WNC's trademark claims against Muylle and Muylle's counterclaim for abuse of process against

WNC, Scott, Ms. McCracken, and Mr. McCracken. The jury returned a verdict in favor of Muylle on WNC's claims for trademark infringement and false designation of origin. The jury also returned a verdict for Muylle on his counterclaim and third party claim for abuse of process, awarding Muylle $81,000.00 against WNC, $81,000.00 against Scott, $81,000.00 against Ms. McCracken, and $27,000.00 against Mr. McCracken (Filing No. 444).

After the jury trial, Weisser hired an attorney and filed a Motion to Set Aside the Judgment of Default that had been entered against him (Filing No. 449), and that Motion was denied (Filing No. 464). The Court set a hearing to determine damages as to the Defaulted Defendants. The damages hearing was held on March 2, 2015. Having considered testimony, arguments and evidence, the Court now makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.

## II.    FINDINGS OF FACT

Prior to this lawsuit and the events that led up to it, Scott and Weisser had been friends since childhood, for almost 24 years. Scott is an Indiana resident, a founder of WNC, and the president of WNC. Scott's business and life partner, Ms. McCracken, is also an Indiana resident, a founder of WNC, and the art director of WNC. Her father, third party defendant Mr. McCracken, is an Indiana resident, a founder of WNC, and the sole owner of WNC. Weisser is now a resident of California but was a resident of Alabama before he moved to California with Muylle to help open a San Francisco location for WNC's expansion.

WNC is a limited liability company organized and existing under the laws of Indiana with its principal office located in Hamilton County, Indiana. WNC is a widely popular venture that offers artistic instruction and entertainment combined with alcoholic beverages offered in a variety of venues, including public and private settings, corporate events, special occasions, and classroom

settings. WNC has acquired substantial goodwill among consumers, and as a result of extensive sales and advertising—especially through social media marketing—the WNC mark is recognized.

In January 2011, Scott and WNC hired Weisser, through his company Weisser Management, as a consultant to develop franchise, license, partnership, confidentiality, non-compete, membership interest, and other business documents for WNC's business expansion. Although Weisser is not a lawyer, Scott asked him to assist in WNC's franchise and business development efforts, which Weisser did from approximately January to August 2011. In March 2011, under the direction of WNC, Weisser assisted in developing a licensing package to offer to potential partners of WNC. The full licensing package consisted of (1) an LLC Membership Interest Purchase Agreement (Tr. Ex. 400), (2) an Option to Purchase Ownership Interest (Tr. Ex. 401), (3) an Operating Agreement (Tr. Ex. 402), (4) a Subscription to Membership Interest (Tr. Ex. 403), (5) a Membership Redemption Agreement and Covenant Not to Compete (Tr. Ex. 404), and (6) an Intellectual Property License Agreement (Tr. Ex. 411).

After Weisser had worked on developing WNC's licensing package, in April 2011, discussions ensued between WNC and Weisser about the expansion of WNC to San Francisco, California. In July 2011, Weisser discussed with WNC that a mutual friend, Muylle, would be his partner in opening a WNC location in San Francisco. On July 5, 2011, Weisser and Muylle formed YN Canvas to operate the to-be-licensed WNC location in San Francisco.

YN Canvas is a limited liability company organized and existing under the laws of Nevada, and it is managed by Weisser and Muylle. YN Canvas was organized to offer artistic instruction and entertainment as licensed by WNC. Weisser Management is a limited liability company organized and existing under the laws of Alabama. Weisser Management is operated by its sole member, Theodore Weisser, to, among other things, help manage YN Canvas.

Throughout July 2011, WNC and Weisser continued discussing the business arrangement for the San Francisco operation, but no mutual agreement was reached regarding the structure of the business relationship. Meanwhile, Weisser and Muylle continued to make preparations to move to San Francisco and start a WNC operation in California. WNC repeatedly asked Weisser and Muylle for a signed written agreement to govern their business arrangement.

On July 29, 2011, Weisser and Muylle signed a license agreement on behalf of YN Canvas and delivered the signed license agreement to WNC (Tr. Ex. 3). Weisser and Muylle then departed for California. The executed license agreement that was delivered to WNC was substantially similar to the Intellectual Property License Agreement (Tr. Ex. 411) that Weisser had drafted for WNC to use with other WNC locations; however, the executed agreement had some revisions to suit YN Canvas's view of the business arrangement. WNC, however, found some of the terms of the license agreement unacceptable and did not execute the agreement.

Upon their arrival in California, Weisser and Muylle opened a San Francisco WNC location. YN Canvas's first event, operating as Wine and Canvas of San Francisco, was held on August 10, 2011. Weisser presumed that the signed license agreement that he had provided to WNC was acceptable and permitted him to operate the WNC location in San Francisco. WNC acted as though the parties had agreed to a business arrangement consistent with the full licensing package developed by WNC and Weisser and that it simply needed to obtain executed documents.

Scott and Ms. McCracken traveled to San Francisco on behalf of WNC to provide assistance to YN Canvas as it launched its first WNC event. Ms. McCracken instructed the painting at the launch event and otherwise assisted. While Scott and Ms. McCracken were in California, additional discussions ensued between WNC, Weisser, and Muylle regarding the need to execute an acceptable agreement, consistent with the full licensing package for the business operations in

San Francisco. Unfortunately, the parties were unable to agree on terms, and no agreement acceptable to all the parties was ever signed. After assisting YN Canvas with the first WNC event in San Francisco on August 10, 2011, Ms. McCracken and Scott returned to Indianapolis.

The parties had some long-distance communications about executing an agreement throughout the following months, but the relationship between them rapidly deteriorated. In October 2011, WNC sent a written agreement for Weisser and Muylle to execute on behalf of YN Canvas. This agreement called for payment of a $10,000 initial start-up fee, WNC's 51% ownership interest in the San Francisco operation, payment of a royalty fee, and inclusion of a non-compete provision (Filing No. 499 at 207 line 12 to 208 line 11); (Filing No. 498 at 238, lines 13–17). YN Canvas did not agree to WNC's proposed terms.

Between August 10 and November 18, 2011, WNC, as well as Scott and Ms. McCracken, consented to the use of its trademark by YN Canvas, Muylle, and Weisser. During this time period the WNC trademark did not make any profit but instead incurred a loss (Filing No. 502 at 41, lines 16–20).

On November 18, 2011, YN Canvas terminated the license agreement which it had executed and delivered to WNC. Thereafter, YN Canvas discontinued using anything that had the WNC logo or name, including aprons, shirts, an A-frame sign, and other marketing collateral. (Filing No. 498 at 244, lines 12-19).

Also on November 18, 2011, YN Canvas, which had been operating as Wine and Canvas of San Francisco, informed its customer base via an email that it no longer was operating as Wine and Canvas of San Francisco and instead was changing its name to Art Uncorked (Tr. Ex. 473). YN Canvas notified its customer base that if they were contacted by anyone representing themselves as WNC, they would be dealing with a different company. The email also explained

that Art Uncorked would continue to provide painting and wine events in the San Francisco area, and it would honor any vouchers that had been purchased through social media marketing such as Living Social, Groupon, or PopSugar, for events of Wine and Canvas of San Francisco. A new website, YELP account, and Facebook page were created for Art Uncorked. Through approximately May 2012, the WNC mark would appear in Art Uncorked's internet source code.[1] However, after WNC sent a notice that Wine and Canvas was still mentioned in the source code, Muylle and Weisser contacted their "web guy" and said, "…if there's any reference at all, make sure you remove it…" (Filing No. 500 at 86, lines 16-22).

A purportedly negative YELP review was posted by a customer identified as "Natalie G." (Filing No. 502 at 10, lines 12–18), to which Muylle responded on his Facebook page in a manner which implied that WNC had hosted the party rather than Art Uncorked. Weisser, however, did not participate in the YELP review communication.

After November 18, 2011, Weisser asserts that any use of the WNC name was unintentional, and he did not deliberately attempt to cause confusion or mistake or to deceive consumers.

On November 28, 2011, WNC initiated this litigation in state court.

### III.  CONCLUSIONS OF LAW

**A.    Default as to YN Canvas and Weisser Management**

As an initial matter, the Court enters a judgment of default as to YN Canvas and Weisser Management. As stated earlier, on November 22, 2013, a Clerk's Entry of Default was entered for these third party counterclaim defendants, but no Rule 55(b) order was entered. "A limited liability company (which [YN Canvas and Weisser Management are]), like a corporation, cannot litigate

---

[1] Source code and object code refer to the "before" and "after" versions of a computer program that is compiled (see compiler) before it is ready to run in a computer. The source code consists of the programming statements that are created by a programmer with a text editor or a visual programming tool and then saved in a file. http://searchsoa.techtarget.com/definition/source-code.

in a federal court unless it is represented by a lawyer." *United States v. Hagerman*, 549 F.3d 536, 537 (7th Cir. 2008). "The usual course when a litigant not entitled to litigate *pro se* loses its lawyer in the midst of the case is to give it a reasonable opportunity to find a new one, and, if it fails, either to dismiss the case or enter a default judgment." *Id.* at 538 (internal citations omitted). YN Canvas and Weisser Management have failed to hire counsel after years of litigation and after a Clerk's Entry of Default. Therefore, the Court enters Default Judgment against YN Canvas and Weisser Management.

**B.      WNC's  Claim for Damages**

By its counsel's statements during the damages hearing, WNC waived its claim for damages under Counts 3, 4, and 5 of the Amended Complaint, and for damages under Count 7 based on any underlying criminal conduct of deception or criminal mischief. WNC is seeking damages under Counts 1 and 2 (Trademark Infringement and False Designation of Origin), Count 6 (Abuse of Process), Count 7 (Civil Action under the Crime Victims Relief Act based on intimidation and conversion), Count 8 (Breach of Contract), and Count 9 (Fraud). Additionally, WNC waived damages on the basis of the Defaulted Defendants' profits, which is one measure of damages under the Lanham Act (Filing No. 502 at 41).

Regarding the claims for which WNC is seeking damages, only the well-pleaded allegations relating to liability in the Amended Complaint are taken as true. After entry of default judgment, "the well-pled allegations of the complaint relating to liability are taken as true, but those relating to the amount of damages suffered ordinarily are not." *Wehrs v. Wells*, 688 F.3d 886, 892 (7th Cir. 2012); *see also* 10A Charles Alan Wright, et al., *Federal Practice and Procedure* § 2688, at 58–59 (3d ed. 1998) ("If the court determines that defendant is in default, the factual allegations of the complaint, except those relating to the amount of damages, will be taken as

true."). Although liability is established through default, the defaulted party is liable only for those damages that arise from the acts and injuries that are pleaded. *Wehrs*, 688 F.3d at 892 (citing 10 *Moore's Federal Practice*, § 55.32[1][c] (3d ed. 2012)).

> The outer bounds of the recovery allowable are of course measured by the principle of proximate cause. The default judgment d[oes] not give [the plaintiff] a blank check to recover from [the defaulted defendant] any losses it ha[s] ever suffered from whatever source. It c[an] only recover those damages arising from the acts and injuries pleaded and in this sense it [i]s [WNC's] burden to show "proximate cause."

*Trans World Airlines, Inc. v. Hughes*, 449 F.2d 51, 70 (2d Cir. 1971), *rev'd on other grounds*, 409 U.S. 363 (1973). "At the damages hearing, the party seeking a default judgment must provide evidence supporting the damages claimed." *Al-Kazemi v. General Acceptance & Inv. Corp.*, 633 F. Supp. 540, 542 (D.D.C. 1986) (citing *Dundee Cement Co. v. Howard Pipe & Concrete Products, Inc.*, 722 F.2d 1319, 1324 (7th Cir. 1983)). The entry of a default order does not, however, preclude a party from challenging the sufficiency of the complaint. *Alan Neuman Prods., Inc. v. Albright*, 862 F.2d 1388, 1392 (9th Cir. 1988), *cert. denied*, 493 U.S. 858 (1989). Further, in accounting for damages, the Court may not award relief different in kind or exceeding in amount what the plaintiff demanded in the complaint. Fed. R. Civ. P. 54(c).

Upon motion of WNC, the evidence from the November 2014 trial was incorporated into the record for the purpose of determining damages. Additional testimony was elicited from Ms. McCracken and Weisser, and new exhibits were admitted. The Court now addresses WNC's claims in turn.

### C. Counts 1 and 2: Trademark Infringement and False Designation of Origin

Trademark infringement occurs when a person, without authorization,

(a) use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or

advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce[s], counterfeit[s], cop[ies], or colorably imitate[s] a registered mark and appl[ies] such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

15 U.S.C. § 1114(1).

Regarding claims for false designation of origin, the Lanham Act provides that:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) . . .

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

Taking the allegations regarding liability as true, as this Court must do, WNC has pleaded a sufficient factual basis to support claims for trademark infringement and false designation of origin, and therefore, the Defaulted Defendants are liable for these violations of the Lanham Act. Thus, the Court turns to damages.

The Lanham Act provides for the recovery of the defendant's profits, any damages sustained by the plaintiff, and the costs of the action for violations of the Lanham Act, including trademark infringement and false designation of origin. 15 U.S.C. § 1117(a). As noted above, WNC waived its right to recover the Defaulted Defendants' profits, so the only claims before the Court are actual damages sustained by WNC and costs of the action.

In assessing damages for trademark infringement and false designation of origin, the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. *Sands, Taylor & Wood v. Quaker Oats Co.*, 34 F.3d 1340, 1347 (7th Cir. 1994). However, monetary recovery under section 35(a) of the Lanham Act must be compensatory in nature and not punitive. *Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145, 1157 (7th Cir. 1994) ("Under this section any recovery to the plaintiff must constitute 'compensation' for its own losses or for the defendant's unjust enrichment; section 1117(a) (unlike section 1117(b)) does not allow a 'penalty' against the defendant."); *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1127 (5th Cir. 1991).

Section 1117 confers a wide scope of discretion on the district court in fashioning a remedy for a trademark infringement subject to the principles of equity. *Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117, 121 (9th Cir. 1968), *cert. denied*, 391 U.S. 966 (1968). "A successful plaintiff in a trademark infringement case is not always entitled to a monetary award in addition to injunctive relief, since any award for damages is subject to the principles of equity which give the court discretion based upon a wide range of considerations." *Ramada Inns, Inc. v. Apple*, 482 F. Supp. 753, 757–58 (D.S.C. 1980); *Otis Clapp & Son, Inc. v. Filmore Vitamin Co.*, 754 F.2d 738 (7th Cir. 1985).

Upon careful review of the evidence from the November 2014 trial (which was incorporated at the damages hearing upon WNC's request), the additional testimony of Ms. McCracken and Weisser, and the new exhibits from the damages hearing, the Court concludes that WNC has not shown any actual damages sustained, arising from any trademark infringement or false designation of origin. A plaintiff wishing to recover damages for a violation of the Lanham Act must prove the defendant's Lanham Act violation, that the violation caused actual confusion

among consumers of the plaintiff's product, and, as a result, that the plaintiff suffered actual injury, *i.e.*, a loss of sales, profits, or present value (goodwill). *Web Printing Controls Co. v. Oxy-Dry Corp.*, 906 F.2d 1202, 1204–05 (7th Cir. 1990). Thus, recoverable damages are limited to the amount of money required to compensate WNC for the actual confusion among consumers for which WNC sustained injury. WNC tendered evidence of the sales and profits of the Defaulted Defendants, which are discussed in Section D "Count 8: Breach/Equitable Relief" below, but it failed to show any actual damages it suffered from the Lanham Act violations and has not shown that it has been damaged by any actual consumer reliance based on confusion or reliance on misleading statements of Weisser or the other Defaulted Defendants.

The third category of recovery under the Lanham Act is the costs of the action. The Lanham Act explains that a prevailing "plaintiff **shall** be entitled . . . to recover . . . the costs of the action." 15 U.S.C. § 1117(a) (emphasis added). Therefore, WNC is entitled to recover its costs of this action from the Defaulted Defendants.

## D.     Count 6: Bad Faith, Tortious Conduct, Abuse of Process, et al.

WNC's Amended Complaint pleads Count 6 with three separate potential causes of action. It is based solely on the Defendants' alleged attempt to delay WNC's trademark registration on March 3, 2012, by requesting an extension of time to oppose the registration of "Wine and Canvas" as a trademark. WNC's factual allegations assert that the request for additional time was an abuse of the legal system and its processes.

> [A]n abuse of process action requires a finding of misuse or misapplication of process for an end other than that which it was designed to accomplish. The purpose for which the process is used is the only thing of importance. Thus, an abuse of process claim has two elements: (1) an ulterior purpose, and (2) a willful act in the use of process not proper in the regular conduct of the proceeding. The gravamen of that tort is not the wrongfulness of the prosecution, but some extortionate perversion of lawfully initiated process to illegitimate ends. There is no liability where the defendant has done nothing more than carry out the process to its

authorized conclusion, even though with bad intentions. A regular and legitimate use of process, though with an ulterior motive or bad intention is not malicious abuse of process.

*Brooks v. Harding*, 2001 U.S. Dist. LEXIS 6777, at *21–22 (S.D. Ind. Jan. 12, 2001) (internal citations and quotation marks omitted).

The allegations in the Amended Complaint do not support this claim. Most of the allegations relating to this claim are conclusory statements, and WNC's last allegation is that it has been "damaged in an amount to be determined as a result of the Defendants' filing of the Extension Request." (Filing No. 36 at 15, ¶92.) WNC was provided an opportunity to prove up its damages resulting from "Defendants' filing of the Extension Request" during the damages hearing, and it failed to do so. WNC did not provide any evidence that it has suffered damages as a result of the Defaulted Defendants' request for additional time to oppose the trademark registration. Therefore, WNC is not entitled to damages on this count.

**E.     Count 7: Civil Action Under the Indiana Crime Victims Act (Intimidation and Conversion)**

To be entitled to relief under Indiana Code § 34-24-3-1, a person must have "suffer[ed] a pecuniary loss as a result of a violation of IC 35-43, IC 35-42-3-3, IC 35-42-3-4, or IC 35-45-9." WNC is seeking civil relief for the criminal acts of intimidation and conversion. Intimidation, codified at Indiana Code § 35-45-2-1, is not a criminal offense enumerated in the Indiana Crime Victims Relief Act for which relief can be awarded in a civil action. Therefore, as a matter of law, WNC cannot be awarded damages against the Defaulted Defendants for any alleged intimidation.

Under Indiana Code § 35-43-4-3, conversion is committed when a person "knowingly or intentionally exerts unauthorized control over property of another person." For this claim, WNC pleaded conclusory allegations that the Defaulted Defendants "have violated I.C. 35-43 in the following particulars: . . . For 'Conversion' as expressed in I.C. 35-43-4-3," and "[a]s a result of

these violations, Plaintiff has suffered actual damages in excess of the minimum jurisdictional requirements of this Court." (Filing No. 36 at 15, ¶¶95–96.) WNC also incorporated the previous paragraphs of the Amended Complaint. But WNC did not plead any specific conduct by the Defaulted Defendants relating to its allegation of criminal conversion. The Court is left to infer that any intentional exertion of unauthorized control over property is related to WNC's trademark, customer lists, and concept. A trademark can be considered property under Indiana law. *See An-Hung Yao v. State*, 975 N.E.2d 1273, 1281 (Ind. 2012). However, in order to be entitled to relief under the Indiana Crime Victims Relief Act, a plaintiff must show that it suffered a pecuniary loss as a result of the criminal conduct, not just that criminal conduct occurred. *See, e.g.*, *Naugle v. Kyler Bros. Servs.*, 2006 U.S. Dist. LEXIS 22921, at *15 (S.D. Ind. Mar. 31, 2006) (failure to plead "determinant sum" led to dismissal of conversion claim and Indiana Crime Victims Relief Act claim); *Scott v. Durham*, 2011 U.S. Dist. LEXIS 578, at *24–25 (N.D. Ind. Jan. 3, 2011) (failure to allege pecuniary loss led to adverse summary judgment). WNC simply does not plead facts to support a claim that a pecuniary loss resulted from any criminal conversion. WNC makes no connection between conversion and a pecuniary loss. Additionally, there is no evidence of a pecuniary loss from any conversion that would allow for an award of damages under the Indiana Crime Victims Relief Act.

## F.      Count 8: Breach/Equitable Relief

Because the Court must accept as true all allegations relating to liability, the Court must accept that the parties orally agreed to a business arrangement as evidenced in the full licensing package attached as Exhibit A to the Amended Complaint (Filing No. 36-1). *See Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013) (courts consider the facts in the complaint as well

as the exhibits attached to the complaint, and where the exhibits contradict the allegations in the complaint, the exhibits generally will control).

A review of the full licensing package reveals that each of the agreements was between WNC and YN Canvas, not Weisser or Muylle individually, with the exception of the "Intellectual Property License Agreement," which was to be between WNC and WC SF BAY LLC. The allegations in the Amended Complaint assert that the parties "would form" WC SF BAY LLC, which "would license" WNC's trademarks and "would operate" a WNC location in San Francisco (Filing No. 36 at 5, ¶28). WC SF BAY LLC "was to be owned by two (2) members:" WNC and YN Canvas. (*Id.*) However, the remaining allegations do not support a conclusion that WC SF BAY LLC actually was ever formed, and the evidence suggests that it never was formed. Therefore, the Court will consider the parties to the "Intellectual Property License Agreement" to be WNC and YN Canvas, which is consistent with the other agreements in the full licensing package, consistent with the proposed operating agreement of WC SF BAY LLC wherein YN Canvas would receive 100% of the net profits, and consistent with the signature lines in the "Intellectual Property License Agreement," requiring signatures in corporate, not individual, capacities. This also is consistent with the evidence presented at trial and during the damages hearing: YN Canvas actually was formed and actually did operate the business in San Francisco.

The "Intellectual Property License Agreement" required the payment of royalties at a rate of 10% on the licensee's gross sales (Filing No. 36-1 at 40). It did not require payment of a start-up license fee. YN Canvas operated the WNC San Francisco location from August 2011 through November 18, 2011. YN Canvas then stopped operating as WNC of San Francisco on November 18, 2011, and it terminated the parties' agreement pursuant to Section 11.2 of the "Intellectual Property License Agreement" (Filing No. 36-1 at 32–33). WNC alleges that the Defendants

breached the parties' agreement by, among other things, failing to pay the royalty fee. The Court must accept this allegation regarding liability. Therefore, the Court concludes that YN Canvas, the Defaulted Defendant who was a party to the agreement, is liable for breaching the parties' agreement by failing to pay royalties, and the Court will now turn to damages on this claim.

Damages are assessed for the time period when YN Canvas had a contractual obligation to pay royalties to WNC—August 2011 to November 18, 2011—at a rate of 10%, which is called for in the "Intellectual Property License Agreement."

WNC and Weisser each tendered evidence during the damages hearing concerning the deposits made into the bank accounts of the Defaulted Defendants from the operation of the WNC San Francisco location. Weisser also submitted evidence of the expenses for the WNC San Francisco location, thereby showing profits and losses. The Court does not take the evidence of expenses into account because the agreement called for royalties on gross sales, not profits.

WNC submitted evidence showing the following deposits: $32,422.71 (August 2011), $10,168.72 (September 2011), $7,517.47 (October 2011), and $3,275.02 (November 1–18, 2011). Weisser submitted evidence showing the following deposits: $29,922.71 (August 2011), $10,068.72 (September 2011), $6,215.50 (October 2011), and $5,265.90 (all of November 2011). Weisser provided sufficient testimony to explain the $2,500.00 difference between the parties' evidence for the August 2011 deposits. Muylle had paid a $2,500.00 capital contribution to YN Canvas in August, so that amount would not have been from sales or revenue. The Court therefore will assess damages for August 2011 using Weisser's evidence of $29,922.71. Regarding the difference between the evidence for September and October, Weisser could only speculate regarding the basis for the difference. Thus, the Court will use WNC's evidence of $10,168.72 and $7,517.47. Regarding the month of November, Weisser provided the deposit amount for the entire

month of November whereas WNC estimated the November deposit through November 18, 2011, which is the date the agreement was terminated. Therefore, the Court will use WNC's evidence of $3,275.02.

WNC urges the Court to add a 40% premium to the bank deposits to account for any difference between gross and net sales, resulting from the sale of discounted vouchers through Groupon, Living Social, and PopSugar. WNC's suggestion of a 40% premium is conjecture based upon varying, possible agreements with these online vendors. Additionally, it is reasonable to presume that not every customer would have paid for the WNC events through Groupon, Living Social, or PopSugar. Certainly some of the sales would have been to full paying customers. WNC did not provide any evidence of what portion of the deposits or gross sales came from full paying customers or from these online vendors. The Court declines to engage in such guesswork to add an additional percentage to the evidence of the deposits submitted in evidence.

WNC also has made a demand for the payment of a $10,000.00 start-up license fee. However, when a party attaches a written instrument to its complaint and incorporates the written instrument into the pleadings, if there are contradictions between the written instrument and the complaint, the written instrument generally will trump. *Bogie*, 705 F.3d at 609. WNC attached and incorporated the "Intellectual Property License Agreement" as part of the full licensing package. That agreement did not require payment of a start-up license fee. Rather, it called for the payment of a 10% royalty on gross sales. To the extent WNC is seeking a start-up license fee in addition to payment of royalties, that request is denied.

WNC additionally asserts that it was damaged by the Defaulted Defendants' continued operation of an art studio venture after the agreement was terminated in November 2011. WNC bases this allegation on a non-competition provision found in the full licensing package.

Indiana courts have generally recognized and respected the freedom to contract. However, covenants to not compete are in restraint of trade and are not favored by the law. Non-competition agreements are strictly construed against the employer and are enforced only if reasonable. Covenants must be reasonable with respect to the legitimate interests of the employer, restrictions on the employee, and the public interest. *Nightingale Home Healthcare, Inc. v. Helmuth*, 15 N.E.3d 1080, 1083 (Ind. Ct. App. 2014). The Court must "determine whether the scope of the agreement is reasonable in terms of time, geography, and types of activity prohibited." *Pathfinder Communs. Corp. v. Macy*, 795 N.E.2d 1103, 1109 (Ind. Ct. App. 2003).

Here, the purported non-competition provision is drafted to prohibit YN Canvas, Weisser, and Muylle from engaging in "any business in competition with [WNC]" for a period not to exceed one year from the date of the agreement. It does not provide any limitation to its geographic scope and does not provide a signature line for Weisser or Muylle in their personal capacity ([Filing No. 36-1 at 44](#)). Because the agreement does not provide a reasonable limit to its geographic scope and does not make Weisser or Muylle signatories in their personal capacity, and because non-competition agreements are strictly construed against the "employer" and are enforced only if reasonable, the Court declines to enforce the unsigned, "oral" non-competition provision against the Defaulted Defendants. Therefore, the Court will not award any damages based on a non-competition provision.

For its breach of the agreement, YN Canvas is liable for an amount of damages totaling $5,088.39. This amount is calculated by applying the 10% royalty to the evidence of deposits for the WNC San Francisco operations: $29,922.71 for August 2011; $10,168.72 for September 2011; $7,517.47 for October 2011; and $3,275.02 for November 1–18, 2011.

**G.      Count 9: Fraud**

WNC's Amended Complaint fails to plead the claim of fraud, Count 9, with sufficient particularity as required by Federal Rule of Civil Procedure 9(b). Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Instead of pleading the circumstances of fraud with particularity, WNC's Amended Complaint simply incorporates the preceding paragraphs and then alleges that "Defendants have committed fraud in fact and fraud in the inducement." (Filing No. 36 at 16, ¶102.) WNC provides none of the "who, what, where, when, and how" of the alleged fraud. Therefore, WNC is not entitled to damages on its claim of fraud.

**H.      *In re Uranium Antitrust Litigation***

Weisser relies on the case *In re Uranium Antitrust Litigation*, 617 F.2d 1248, 1262 (7th Cir. 1980), to argue that any damage award against him is impermissible because it would be inconsistent with the jury's verdict against WNC and in favor of Muylle following the November 2014 trial. Weisser explains that WNC's allegations against him assert joint liability with Defendant Muylle, and therefore, the jury verdict in favor of Muylle and a subsequent damage award against Weisser would be inconsistent.

The evidence shows that the extent and level of involvement in business negotiations and the subsequent business operations varied among the four defendants. The identity of the actual contracting parties and the extent of the defendants' knowledge are, among other considerations, facts that could have led the fact finder to different conclusions regarding the various defendants. The evidence shows that many of the allegations in the Amended Complaint of conduct committed by all defendants was actually committed singly and separately by various defendants. Therefore,

the *Uranium* case is not applicable here. The Court also notes that damages are not awarded against

Weisser, only the costs of this action because of his status as a Defaulted Defendant.

I.  **Injunctive Relief**

In its prayer for relief, WNC seeks injunctive relief pursuant to 15 U.S.C. § 1116 that

Defendants and their owners, partners, officers, directors, agents, servants, employees, representatives, licensees, subsidiaries, manufacturers and distributors, jointly and severally, are enjoined throughout the world during the pendency of this action, and permanently thereafter to:

 (i) Infringing the WC Marks in any manner;

 (ii) Manufacturing, marketing, advertising, distributing, selling, promoting, licensing, exhibiting, or displaying any product or service using WC Marks or any copies or counterfeits thereof or anything confusingly similar thereto;

 (iii) Otherwise infringing the WC Marks;

 (iv) Using any false description, representation, or designation, or otherwise engaging in conduct that is likely to create an erroneous impression that Defendants' products are endorsed by Plaintiff or any related company, sponsored by Plaintiff or any related company, or are connected in anyway with Plaintiff and/or Plaintiff or any related company;

 (v) Interfering in the existing contracts or business expectancies of Plaintiff in any manner whatsoever;

 (vi) Using the WC Marks in any manner whatsoever;

 (vii) Holding themselves as licensees or otherwise authorized users of the WC Marks;

 (viii) Using the WC Marks in promotional literature or materials, including those posted on the Internet.

([Filing No. 36 at 17](#)–18.) Because WNC has pleaded a sufficient factual basis to support claims

for trademark infringement and false designation of origin the prayer for injunctive relief is

granted.

# IV. __CONCLUSION__

Based on the foregoing findings of fact and conclusions of law, Default Judgment is entered against Defendant YN Canvas CA, LLC in the amount of $5,088.39 on WNC's breach of contract claim. WNC is entitled to recover its costs of this action from Defaulted Defendants Theodore Weisser, YN Canvas CA, LLC, and Weisser Management Group, LLC. Pursuant to Local Rule 54-1, WNC must submit its bill of costs within **fourteen (14) days** of the date of this Order. Counsel is encouraged to review Seventh Circuit case law and the federal statutes governing costs. WNC is also granted injunctive relief, and the Defaulted Defendants are enjoined as set forth in this Entry. Final judgment shall be entered accordingly.

**SO ORDERED.**

Date: 5/1/2015

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

P. Adam Davis
DAVIS & SARBINOFF LLP
adavis@d-slaw.com

Carol Nemeth Joven
PRICE WAICUKAUSKI & RILEY
cnemeth@price-law.com

Ronald J. Waicukauski
PRICE WAICUKAUSKI & RILEY
rwaicukauski@price-law.com