## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| WINE & CANVAS DEVELOPMENT LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:11-cv-01598-TWP-DKL |
| | ) |
| THEODORE WEISSER, YN CANVAS CA, LLC, | ) |
| and WEISSER MANAGEMENT GROUP, LLC, | ) |
| | ) |
| Defendants. | ) |

**ORDER ON PENDING MOTIONS**

This matter is before the Court on a Motion for Turnover of Trademarks (and for any Funds Received as Royalties Since the Purported Transfer) ("Motion for Turnover") filed by Defendant Christopher Muylle ("Muylle") (Filing No. 620); a Motion to Strike or Disregard Unsupported Factual Assertions, Legal Conclusions and/or Other Irrelevant, Scandalous and/or Harassing Allegations filed by Plaintiff Wine & Canvas Development LLC ("WNC") (Filing No. 627); and a Motion to Strike Omnibus Filing (ECF 628), for Admonishment of Muylle and Counsel; and, Alternatively, for Extension of Time filed by WNC (Filing No. 629). The Court will address each motion in turn.

### I. MUYLLE'S MOTION FOR TURNOVER OF TRADEMARKS

Muylle asks the Court to order that the "Wine and Canvas" trademark (the "Mark") be turned over to him, along with any royalties earned therefrom, until his judgments in this case against counterclaim defendants WNC, Anthony Scott ("A. Scott"), and Tamara Scott ("T. Scott") are satisfied. WNC originally registered the Mark, and it was owned by WNC when WNC commenced this suit. An agreement signed by WNC and non-party Wine and Canvas IP Holdings, LLC ("WNC IP") on January 1, 2012, purports to assign the Mark to WNC IP. Muylle argues two

legal bases to compel the surrender of the Mark to him. First, WNC's transfer of the Mark to WNC IP was a fraudulent transfer under Indiana Code §§ 32-18-2-14 and 32-18-2-15, and, second, WNC IP is the alter ego of WNC and/or the Scotts. Under the first theory, WNC's transfer of the Mark would be voidable and ineffective regarding Muylle, which permits him to reach the Mark and its royalties in the hands of either WNC or WNC IP as if the transfer did not occur. Under the second theory, WNC and WNC IP are deemed to be one entity, which permits Muylle to reach the Mark and its royalties from WNC. The Court will treat Muylle's Motion for Turnover as part of the proceedings supplemental to collect his judgments.

### A. Procedural Background

This case was initiated on November 29, 2011, by WNC filing its original complaint in Indiana state court ([Filing No. 1](); [Filing No. 1-1]()). Defendants Theodore Weisser ("Weisser") and Muylle removed the case to this Court in December 2011. On September 4, 2012, WNC filed its operative Amended Verified Complaint for Declaratory Judgement, Injunctive Relief and Damages ("Complaint") ([Filing No. 36]()). The Complaint pled claims of trademark infringement, false designation of origin, trademark dilution, and counterfeit marks, all under the Lanham Act, based on Muylle's alleged use of WNC's trademarks, particularly the "Wine and Canvas" Mark at issue in this Motion.[1] In April 2013, Muylle filed his operative answer to WNC's Complaint ("Answer") ([Filing No. 66]()). In his Answer, Muylle pled counterclaims against WNC for cancellation of the Mark's registration and for abuse of process, and he joined non-parties Anthony Scott and Tamara Scott ("the Scotts") as defendants to the abuse-of-process counterclaim.[2]

---

[1] This summary of the claims and counterclaims in the case includes only those that are relevant to or helpful in understanding Muylle's Motion for Turnover.

[2] Muylle called his claims against the Scotts "third party claims," and the label has persisted throughout this case. They are not third-party claims. *See* Fed. R. Civ. P. 14. The Scotts were simply joined as defendants on Muylle's abuse-of-process counterclaim against WNC. *See* Fed. R. Civ. P. 13(h).

WNC's and the Scotts' answer to Muylle's counterclaims—Amended Answer, Defenses & Counterclaims (Filing No. 101)—included state-law counterclaims by the Scotts against Muylle for abuse of process, improper taking, conversion, and unfair competition.

On August 15, 2014, the Court entered summary judgment against Muylle's counterclaim to cancel the Mark and against all of WNC's claims against Muylle except for its claims for trademark infringement and false designation of origin (Filing No. 341). Muylle's counterclaim for abuse of process also survived summary judgment. All of the surviving claims were tried to a jury from November 17 through 20, 2014. The jury returned a verdict in favor of Muylle on WNC's claims against him and on his counterclaim for abuse of process. The jury awarded Muylle $81,000.00 against WNC, $81,000.00 against A. Scott, and $81,000.00 against T. Scott (Filing No. 444). The Court later awarded Muylle his fees and costs in the amounts of $175,882.68 against WNC and $1,661.30 against WNC and the Scotts (Filing No. 535; Filing No. 549).

The Court earlier had entered default judgment against defendants Weisser, YN Canvas CA, LLC, and Weisser Management Group, LLC on WNC's claims, and the Court held a hearing on damages on March 2, 2015. It awarded WNC damages of $5,088.39 against YN Canvas CA, LLC. The Court also awarded WNC its costs and issued an injunction prohibiting these three defendants from infringing WNC's trademarks (Filing No. 510).

According to Muylle, as of June 2016, the only payments that he has received on his judgments has been T. Scott's remittance of $3,515.65 pursuant to a garnishment order (Filing No. 620 at 2). He has pursued proceedings supplemental to collect on his judgments.

B.  **Factual Background**[3]

On January 1, 2012, A. Scott signed an Intellectual Property Agreement ("IP Agreement") ([Filing No. 613](#)) as "Manager" for the two signatory parties, WNC and WNC IP. The IP Agreement transferred all rights, title, and interest in all of WNC's intellectual property (including trademarks, copyrights, and domain names), except for the Mark, to WNC IP. The Mark was temporarily retained by WNC with the provision that,

> ownership of the Mark shall not vest in Transferee [WNC IP] until the occurrence of any of the following (whichever shall occur first): (1) the dismissal of all claims against all parties WITH PREJUDICE in Litigation [meaning this lawsuit]; (2) a final judgment as to all parties and all claims in the Litigation, (3) the trial on the merits in the Litigation, (4) a settlement signed by all parties to the Litigation, (5) a written document executed by both Transferor and Transferee subsequent to date hereof transferring ownership of the Mark by Transferor to Transferee; or (6) upon the passage of ten (10) years from the date hereof, at which time ownership of the Mark shall automatically vest in Transferee . . . .

IP Agreement, ¶ 1. The agreement also provided that, in the interim, before full ownership "vested", WNC IP would have an irrevocable and exclusive worldwide license to use the Mark in its discretion, including "the exclusive right to license the Mark and to generate income therefrom." *Id.* The agreement provided that WNC IP would pay WNC one hundred dollars and grant it an irrevocable non-exclusive license to use the Mark in connection with WNC's Indianapolis location for a term of twenty years. *Id.*

The January 1, 2012 execution of the IP Agreement occurred one month after this suit was filed, nine months before Muylle filed his first counterclaims against WNC (for violation of California's franchising code and cancellation of the Mark), and sixteen months before Muylle filed his operative amended counterclaims, which added the claim for abuse of process and added the Scotts as counterclaim defendants on that claim.

---

[3] The following narrative is taken from the evidence cited by the parties.

The IP Agreement's initial recitals include an acknowledgement of the pendency of this suit. It also includes a recital explaining the genesis of the agreement. It states that, prior to this suit being filed, Weisser, serving as a consultant, was in the process of developing a system for expanding the Wine & Canvas concept throughout the United States. That system included the creation of WNC and WNC IP with WNC owning and operating the Indianapolis location and WNC IP owning and controlling all of the intellectual property. However, after Weisser left, it was discovered that he had organized only WNC and not WNC IP. The recital noted that WNC IP had since been organized[4] and that the IP Agreement was intended to fulfill the original business plan for WNC IP to acquire and hold WNC's intellectual property. IP Agreement at 1.

On August 29, 2014, an affidavit by A. Scott was submitted in support of WNC's motion to dismiss a separate copyright suit in the Middle District of Florida (Filing No. 626-1 at 51–75). In this affidavit, A. Scott states that WNC IP "is the exclusive owners of multiple trademarks (by rights granted by [WNC] and by title), both unregistered and registered. Such marks include common law trademarks, service marks, other marks and (1) that certain trademark 'WINE AND CANVAS' registered with United States Patent and Trademark Office . . . ." *Id*. at 51–52. On November 3, 2014, A. Scott submitted a second affidavit in support of WNC's reply in order to refute an assertion that WNC IP had falsely averred that it was the exclusive owner of the Mark. In this affidavit, A. Scott amended his previous one by averring that, while WNC IP acquired other trademarks of WNC and acquired some exclusive rights in the Mark, WNC, not WNC IP, was the owner of the Mark. *Id*. at 76–81, ¶¶ 8–10.

---

[4] On April 7, 2011, WNC (which had been organized in 2010 as AVA Ventures, LLC) registered its name change to WNC with the Indiana Secretary of State (Filing No. 626-1 at 2–3). WNC IP's organization was registered on December 22, 2011, effective on January 1, 2012, the date of the IP Agreement's execution. *Id*. at 4–6.

Near the end of the jury trial in November 2014, Muylle filed his Motion for Judgment as a Matter of Law (Filing No. 434). He argued that WNC lacked standing to maintain a claim for infringement of the Mark because it had assigned the Mark to WNC IP. Citing *Specht v. Google, Inc.*, 747 F.3d 929, 933 (7th Cir. 2014), he argued that only the current owner or registrant of a trademark has standing to assert an infringement claim. The Court heard argument and took testimony on the motion. The factual basis for his contention that WNC had transferred the Mark to WNC IP was A. Scott's averments in his first Florida affidavit that WNC IP is the exclusive owner of the Mark (Filing No. 626-1 at 14, 29, 42–45). A. Scott testified that WNC is the exclusive owner of the Mark while WNC IP has the exclusive right to license the Mark as well as owning other trademarks. *Id.* at 32–33, 35, 38, 46. The Court denied Muylle's motion, concluding that there was no evidence that anyone other than WNC was the owner of the Mark at the time that it was registered. *Id.* at 48.

On January 1, 2015, WNC and WNC IP executed a Trademark Ownership Acknowledgement ("Acknowledgement"). *Id.* at 9. A. Scott again signed on behalf of both parties, this time in his capacity as "President" of each entity. By this instrument, WNC and WNC IP acknowledged the occurrence of one of the "trigger events" in the IP Agreement by which WNC IP "automatically acquired ownership of the Mark," namely, the completion of the trial on the merits in this suit. They agreed that, pursuant thereto, "all rights, title and interest in and to the Mark that have no[t] previously been transferred by [WNC] to [WNC IP] are now transferred in full . . . ." *Id.* The Acknowledgement was executed after the November 2014 trial and verdict but before the March 2, 2015 damages hearing on the defaulted claims.

There has been no assertion or showing that copies of the IP Agreement or the Acknowledgement were produced, or their terms were disclosed, to Muylle until March 2016.

## C. Discussion

In his Motion for Turnover, Muylle asserts that his counsel first became aware of the IP Agreement and the Acknowledgement on March 7, 2016, when his counsel was given copies of the documents during a creditors' meeting in WNC's bankruptcy proceeding. He asserts that the documents show that WNC did not own the Mark as of, at the latest, January 1, 2015, the date of the Acknowledgement. He also contends that the consideration that WNC IP gave to WNC for the transfer was substantially less than the reasonable value of the Mark. Muylle does not affirmatively and decisively assert that the Mark was, in fact, transferred to WNC IP. Rather he argues under two theories that, even if it was transferred, he is entitled to a turnover of the Mark and all royalties earned therefrom until his judgments are satisfied.

First, a transfer from WNC to WNC IP was a fraudulent transfer which renders it voidable as to him under Indiana Code §§ 32-18-2-14 and 32-18-2-15. In support of this argument, Muylle relies on the IP Agreement, the Acknowledgement, A. Scott's trial testimony, and the U.S. Patent and Trademark Office's electronic registration record of the Mark as of May 11, 2016, which shows WNC as the owner of the Mark. Second, Muylle argues that WNC IP is only an alter ego of WNC and/or the Scotts, which renders the Mark reachable through WNC. In support of this theory, Muylle refers to the Scotts' testimony at the hearing on proceedings supplemental and discovery responses.

WNC gives several responses. First, it argues that Muylle has not designated or authenticated admissible evidence in support of his motion. Second, because obtaining the Mark from WNC IP's possession under the theory of fraudulent transfer or from WNC's possession under an alter ego theory requires that a transfer occurred, Muylle must assert that there was a transfer, yet he takes no position on the question and has previously asserted that no transfer took

7

place. Third, the Court lacks jurisdiction to hear what amounts to a new claim against non-party WNC IP to quiet title to the Mark without all the proper procedures of an independent suit, including trial.[5] Fourth, WNC argues that the elements of a fraudulent transfer are not shown. WNC does not address the merits of Muylle's alter ego argument.

### 1. Fraudulent transfer under Indiana Code § 32-18-2-14.

A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

> (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
>
> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
>> (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>>
>> (B) intended to incur or believed or reasonably should have believed that the debtor would incur debts beyond the debtor's ability to pay as the debts became due.

Ind. Code § 32-18-2-14.[6]

In Indiana, analysis of the first option for finding a fraudulent transfer under Section 14(1) "actual intent" is guided by consideration of whether "badges of fraud" are present. These include:

> (1) the transfer of property by a debtor during the pendency of a suit; (2) a transfer of property that renders the debtor insolvent or greatly reduces his estate; (3) a series of contemporaneous transactions which strip a debtor of all property available for execution; (4) secret or hurried transactions not in the usual mode of doing business; (5) any transaction conducted in a manner differing from customary methods; (6) a transaction whereby the debtor retains benefits over the transferred

---

[5] As noted above, the Court construes Muylle's motion to be part of proceedings supplemental in this case, by which a judgment creditor can obtain property belonging to a judgment debtor — in the debtor's own hands or in the hands of a non-party — in satisfaction of a judgment, without the necessity for a separate suit.

[6] Amendments to this section will go into effect on July 1, 2017. The amendments place the current text into new subsection (a); change "fraudulent" in the first sentence to "voidable;" add subsection (b) consisting of a list of factors that a court may consider when determining actual intent (the factors track the "badges of fraud" discussed *infra*); and add subsection (c) which places the burden of proving the elements by a preponderance of the evidence on the creditor.

property; (7) little or no consideration in return for the transfer; and (8) a transfer of property between family members.

*Continental Casualty Co. v. Symons*, 817 F.3d 979, 988 n. 1 (7th Cir. 2016) (quoting *Otte v. Otte*, 655 N.E.2d 76, 81 (Ind. Ct. App. 1995)).

Muylle argues that WNC's transfer of the Mark bears seven of these badges of fraud. First, the transfer was made during the pendency of this lawsuit. While that is true, it is also true that the transfer took place soon after this suit was filed, nine months before Muylle filed any counterclaims against WNC, and sixteen months before he filed his abuse of process counterclaim and brought in the Scotts as additional defendants. The timing of the transfer in these circumstances does not indicate an attempt to spirit away assets to protect them from judgment execution. Muylle also does not offer any evidence or argument against A. Scott's explanation that there were plans, even before suit was filed, to organize WNC IP for the purpose of holding and licensing all intellectual property or his explanation that WNC retained ownership of the Mark in order to preserve its standing in this suit.

Second, Muylle contends that the transfer rendered WNC insolvent or greatly reduced its assets. But he provides no basis for finding that WNC was rendered insolvent after the transfer; there is no showing or suggestion of WNC's post-transfer assets and liabilities then existing or reasonably expected. WNC responded that, at the time of the IP Agreement there were only two authorized Wine and Canvas locations, Indianapolis and Bloomington. At that time, WNC, as owner of the Mark and operator of the Indianapolis location, paid no licensing fees, and the Bloomington location paid no more than $300 per month for a little over six months. WNC contends that the licensing and expansion system had yet to be fully realized at the time of the IP Agreement and that WNC had no way of knowing then that there would be over fifty locations by the time ownership of the Mark automatically transferred at the end of trial, over two years later.

9

The post-transfer expansion of the WNC business and the successful licensing of the Mark shows that the Mark did have substantial value at the end of the trial, but Muylle has not shown that the Mark's value then represented a reasonable assessment of its value over two years earlier, at the time of the IP Agreement.

Third, Muylle contends that the transfer was a secret or hurried transaction, not in the usual mode of doing business. In support, he points to the fact that (1) WNC did not disclose the transfer instruments to him or the Court while repeatedly representing during the litigation that WNC owned the Mark, and (2) WNC failed to amend the Mark's registration to identify WNC IP as the new owner until long after the transfer. According to the IP Agreement and the Acknowledgement, on which Muylle relies, WNC did in fact own the Mark, albeit temporarily, after the IP Agreement was executed, and it continued to own it up to the end of the trial. In addition, WNC took no additional action later to transfer ownership to WNC IP; rather, ownership automatically passed to WNC IP by operation of the agreement.[7] Muylle does not suggest any evidence that WNC or A. Scott affirmatively misrepresented, in this case, ownership of the Mark through the end of the trial. A. Scott's first affidavit submitted in the Florida litigation did misrepresent ownership of the Mark at that time, but it misrepresented that WNC IP, not WNC, owned the Mark and the apparent mistake was corrected by his second affidavit.

However, there was a lack of candor in WNC's and the Scotts' failures to disclose that the IP Agreement immediately transferred a vested future interest in sole ownership of the Mark to WNC IP, which interest would be realized upon the occurrence of the earliest of six possible

---

[7] Muylle does not argue that the transfer was secret because WNC failed to disclose the IP Agreement's immediate grant to WNC IP of an irrevocable and exclusive license to use the Mark in its discretion, including the exclusive right to license it and generate income therefrom, which, arguably, constituted the primary value of the Mark. He argues only that WNC and the Scotts kept secret the (future) transfer of ownership of the Mark.

10

triggering events, one of which was certain to occur.[8]  That transfer left WNC with a temporary ownership.  WNC and the Scotts knew that the automatic transfer of WNC's primary asset, and an expected source of income under the planned expansion, to a non-party at the conclusion of trial could defeat or substantially hinder Muylle's collection of any judgment against WNC.  Thus, WNC's and A. Scott's repeated statements and testimony that WNC owned the Mark, while technically true at the time and for a time, were not the complete story.  However, the inferential force of this lack of candor is diminished by Muylle's apparent failure to diligently pursue all of the facts about the Mark's ownership and licensing rights, including discovering the operative agreements despite various clues and indications that a transfer of other WNC trademarks and licensing rights to the Mark from WNC to WNC IP had occurred and despite the contrary statements in A. Scott's first Florida affidavit.[9]

WNC also affirmatively misrepresented the ownership of the Mark in one instance.  In its March 27, 2015, proposed findings and conclusions submitted after the March 2, 2015, default damages hearing, WNC represented that it owned the Mark.  All three versions if its findings and conclusions contain the identical relevant proposed finding:

> At all times pertinent hereto, Plaintiff was the exclusive owner of multiple trademarks, both unregistered and (now) registered.  Such marks include common law trademarks, service marks, other marks and that certain trademark "WINE AND CANVAS" registered with the United States Patent and Trademark Office (Reg. No. 4,185,017) (the "WC Marks") . . . .

([Filing No. 509 at 2](), ¶ 7.)

This statement parallels the relevant averment in A. Scott's first Florida affidavit (described above), except that the Florida affidavit attributed ownership of the Mark to WNC IP, instead of

---

[8] The sixth condition was simply the passage of ten years from the date of the IP Agreement.

[9] Muylle did not argue that WNC failed to disclose the IP Agreement's transfer of a future ownership interest to WNC IP and/or failed to produce the instruments in response to discovery requests.

11

WNC. According to WNC now, it did not, in fact, own the Mark at the time of the damages hearing. In addition, while not shown to be an affirmative misrepresentation, as opposed to neglect, neither WNC nor WNC IP amended the official registration of the Mark to identify the change in ownership until April 2016, long after the automatic transfer ([Filing No. 620-2](#)).

Fourth, Muylle contends that the transfer was conducted in a manner differing from customary methods, "including a transfer that was contingent on certain events, including the trial in this matter." But he does not explain or provide support for what the customary methods were or how the transfer differed from them. Many contracts contain provisions that are contingent upon certain occurrences. The Court draws no inference from this factor.

Fifth, Muylle contends that WNC retained benefits over the Mark after the transfer. While WNC temporarily retained ownership of the Mark after the IP Agreement, it immediately and irrevocably transferred exclusive licensing rights for the Mark to WNC IP. Thus, WNC retained only use rights for the Indianapolis location. After ownership was transferred to WNC IP at the end of trial, WNC retained an irrevocable and non-exclusive twenty-year license to use the Mark for the Indianapolis location. The use rights that WNC retained following either transfer are not significant enough to infer a deceptive intent behind the transfers.

Sixth, Muylle asserts that WNC IP gave little consideration in return for its acquisition of ownership. WNC IP paid $100 and granted WNC a non-exclusive license to use the Mark in connection with the Indianapolis location for twenty years. The Court finds this "badge of fraud" to be neutral. While the Mark was not earning a great deal of money at the time of the IP Agreement, WNC and the Scotts were implementing a plan for a licensing system and expansion, for which the Mark was intended to be a key asset and source of income. Their intentions and expectations were that the Mark would be generating income and those expectations eventually

were realized. However, as noted above, it has not been shown that the future increase in value of the Mark was sufficiently concrete in January 2012 to infer that the consideration exchanged at that time shows an intent to defraud, or secure assets from, creditors in this or any other case.

Seventh, the transfer of the Mark was between related entities. This factor is undisputed.

Having weighed these "badges of fraud," the Court finds that WNC's lack of candor regarding its transfer of a future interest in the Mark, its misrepresentations regarding ownership of the Mark in its findings and conclusions submitted for the damages hearing, and the transfer between related entities do not outweigh the contrary or neutral inferences from the other "badges." Muylle does not point to any requirement that WNC disclose the future interest transferred to WNC IP, and he could have been more diligent in discovering the details of the transfer.

The misrepresentation in WNC's proposed findings and conclusions is more troubling, considering that it was an affirmative misrepresentation and came after the Mark's value had become apparent. However, there is no indication that the misrepresentation was intentional or calculated to defeat the collection of Muylle's judgment rather than the result of a careless repetition of a previously corrected formulation. Finally, while the transfer was between related entities, that fact does not suggest a deceptive intent considering the counter evidence of a long-standing business plan to create WNC IP for the purpose of holding and licensing all of the WNC intellectual property. Therefore, the Court finds that Muylle has not shown an actual intent to hinder, delay, or defraud creditors under Indiana Code § 32-18-2-14(1).

To satisfy Indiana Code § 32-18-2-14(2), Muylle must show that WNC did not obtain a reasonably equivalent value in exchange for its transfer of ownership of the Mark *and* either (1) that it was engaged or about to engage in a business or transaction for which it had insufficient assets or (2) that it intended to incur or believed or reasonably should have believed that it would

incur debts beyond its ability to pay. Regardless of the reasonable equivalence of the consideration to the Mark, Muylle presented no evidence or assertions regarding the state of WNC's assets and debts after the transfer in relation to any actual or intended business or transactions. Therefore, the Court finds that Muylle has not shown satisfaction of Indiana Code § 32-18-2-14(2).

### 2. Fraudulent transfer under Indiana Code § 32-18-2-15.

A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if:

(1) the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation; and

(2) the debtor:

(A) was insolvent at that time; or

(B) became insolvent as a result of the transfer or obligation.

Ind. Code § 32-18-2-15.[10]

Because Muylle did not present or suggest any evidence that WNC was insolvent at the time the IP Agreement was executed or at the time complete ownership of the Mark was transferred at the end of the trial, the Court finds that he has failed to prove satisfaction of Indiana Code § 32-18-2-15. The Court concludes that Muylle has not shown that WNC's transfer of ownership of the Mark to WNC IP was fraudulent or voidable as to him under Indiana Code §§ 32-18-2-14 or -15.

### 3. Alter ego.

Muylle argues that WNC IP is the alter ego of WNC, and therefore, its assets, including the Mark and the royalties earned therefrom, are WNC's assets and available to satisfy Muylle's judgments.

---

[10] Amendments to this section go into effect on July 1, 2017. The amendments place the current text into new subsection (a); change "fraudulent" in the first sentence to "voidable;" and add new subsection (b) that places the burden of proving the elements for relief by a preponderance of the evidence on the creditor.

Indiana courts hesitate to pierce the corporate veil but will do so to prevent fraud or injustice to a third party. Generally speaking, the corporate form may be disregarded where one corporation is so organized and controlled and its affairs so conducted that it is a mere instrumentality or adjunct of another corporation.

Alter-ego analysis in Indiana proceeds along the so-called *Aronson* factors, which include:

> (1) undercapitalization; (2) absence of corporate records; (3) fraudulent representation by corporation shareholders or directors; (4) use of the corporation to promote fraud, injustice or illegal activities; (5) payment by the corporation of individual obligations; (6) comingling of assets and affairs; (7) failure to observe required corporate formalities; or (8) other shareholder acts or conduct ignoring, controlling, or manipulating the corporate form.

Where, as here, a court is asked to decide whether two or more affiliated corporations should be treated as a single entity, the analysis expands to consider other factors in addition to those from *Aronson*, including whether similar corporate names were used; whether there were common principal corporate officers, directors, and employees; whether the business purposes of the corporations were similar; and whether the corporations were located in the same offices and used the same telephone numbers and business cards.

*Symons*, 817 F.3d at 993–94 (citations and quotation marks omitted).

Muylle alleges a series of assertions that he argues shows satisfaction of the *Aronson* factors:

(1) WNC IP pays the $3,500 monthly loan payment for a yacht owned by Boat and Breakfast Charters, LLC, a company owned by T. Scott that has no business operations. The promissory note is signed by Boat and Breakfast Charters, LLC, WNC, and A. and T. Scott. The yacht has no business purpose but is used for the personal benefit of the Scotts. Muylle refers to "discovery in proceedings supplemental" as the source of this information.

(2) WNC IP pays the $1,450 monthly lease payments for the Scotts' personal residence. Muylle does not refer to any source of this information.

15

(3) WNC and/or WNC IP "may be making or have made" loan payments for T. Scott's Bentley automobile. The source is "information and belief."

(4) WNC's and WNC IP's common owner is Kathy McCracken, the late defendant Donald McCracken's wife. Mr. McCracken was the previous owner. Muylle attributes this information to A. Scott's testimony at the hearing on proceedings supplemental.

(5) WNC and WNC IP are located at the same address. Muylle attributed this information to T. Scott's testimony at the hearing on proceedings supplemental.

(6) A. Scott is the president of both WNC and WNC IP. The source of this allegation is A. Scott's testimony at WNC's bankruptcy creditors' meeting.

(7) A. Scott receives $5,000 monthly income from Scott Staffing and Management Services, LLC, which is funded by $1,000 from WNC and $4,000 from WNC IP. The source of this information is A. Scott's testimony at the hearing on proceedings supplemental.

(8) T. Scott was a W-2 employee of WNC, which paid her salary, but she performed work for both WNC and WNC IP. She is now a W-2 employee of Scott Staffing. Muylle refers to T. Scott's proceedings supplemental testimony as the source of this allegation.

These allegations speak to the *Aronson* factors of (1) payment by the corporation of individual obligations (relevant to WNC IP being an alter ego of the Scotts, not WNC), (2) common principal corporate officers (A. Scott is president of both) and common employees (T. Scott performed work for both entities in the past), (3) common corporate address, and (4) comingling of corporate assets (WNC and WNC IP split the funding of A. Scott's salary and T. Scott formerly was paid by WNC but performed work for both entities). Muylle did not make any allegations or assertions regarding the factors of undercapitalization; absence of corporate records; fraudulent representation by corporate shareholders or directors; use of the corporation to promote

fraud, injustice, or illegal activities; failure to observe corporate formalities; other conduct of ignoring, controlling, or manipulating the corporate form; or same telephone numbers and business cards. It is fair to note that the factors of similar corporate names and business purposes are present despite not being asserted by Muylle.

Muylle did not submit or cite any evidence to support his allegations about, *inter alia*, corporate payments of the Scotts' personal obligations, common ownership of WNC and WNC IP, and funding of the Scotts' salaries, despite Muylle's references to court-proceedings testimony and proceedings-supplemental discovery, which should have been easy enough to submit (or cite, if already part of the Court's record). Even after WNC challenged the lack of admissible evidence to support Muylle's allegations, Muylle merely requested the Court to set the matter for a hearing if it "finds that there is a disputed issue or issues of fact . . . ." ([Filing No. 628 at 7](#).)

Because Muylle did not submit or cite any evidence in support of his alleged *Aronson* factors, the Court finds that he has not carried his burden of persuasion. His insistence that the Court schedule a hearing is a non-starter because the Court will not determine whether a hearing would be necessary or helpful until after it is given evidence. In addition, even had Muylle submitted or cited admissible supporting evidence, and the Court credited that evidence, the Court is not convinced that Muylle's showing carries his burden. The most significant factor in support of an alter ego relationship is the entities' payments of personal, non-business expenses and debts of the Scotts when A. Scott is the chief officer of both entities. The weight of the entities' common ownership (Ms. McCracken), officers (A. Scott), employees (T. Scott), and address is lessened considering that both WNC and WNC IP are small entities involved in the same overall business. But not all small, related entities are alter egos of each other. Without information regarding the entities' observances of corporate formalities, absence of corporate records, inter-entity payments

of expenses and/or provisions of capital and funds, and other indications of separate or unified corporate existences, the Court is not convinced that the alleged *Aronson* factors lead to a certain conclusion. Finally, because A. Scott served as president of both entities, the fact that his total monthly income was funded by both of them, funneled through Scott Staffing, which was described as a payment processor, does not by itself suggest improper comingling of assets or an alter-ego relationship. Any significance to the particular percentages that each entity paid depends on the division and value of the work that A. Scott performed for each. The Court concludes that Muylle has not shown that WNC IP is the alter ego of WNC.

For the above reasons, the Court **DENIES** Muylle's Motion for Turnover of Trademarks ([Filing No. 620](#)).

## II. WNC'S MOTION TO STRIKE OR DISREGARD UNSUPPORTED FACTUAL ASSERTIONS, ETC.

WNC asks the Court to strike or disregard "Unsupported Factual Assertions, Legal Conclusions and/or Other Irrelevant, Scandalous and/or Harassing Allegations" contained in Muylle's Motion for Turnover ([Filing No. 627](#)). "Motions to strike are generally disfavored because they may serve only to delay. Therefore, courts have required a party to show prejudice to prevail on a motion to strike." *Matysik v. Judd Transp., L.L.C.*, 2015 U.S. Dist. LEXIS 169968, at *4 (S.D. Ind. Dec. 21, 2015) (citation omitted).

WNC has provided no legal basis to grant its Motion to Strike, and the arguments in its Motion are generally a regurgitation of its arguments in its response brief to the Motion for Turnover. In light of the Court's decision noted above on Muylle's Motion for Turnover, and because the Court is able to discern unsupported factual assertions, legal conclusions, and irrelevant, scandalous, and harassing content, WNC's Motion to Strike ([Filing No. 627](#)) is **DENIED**.

### III. WNC'S MOTION TO STRIKE OMNIBUS FILING

WNC requests that the Court strike Muylle's combined reply/response brief at Docket Number 628, which is Muylle's reply in support of his Motion for Turnover and his response in opposition to WNC's Motion to Strike Unsupported Factual Assertions, Etc. (Filing No. 629). WNC also asks the Court to strike Muylle's request for a hearing on the issues. WNC argues that striking Muylle's filing is appropriate because it violated Local Rule 7-1. WNC further asserts that admonishing Muylle and his counsel is warranted.

As noted above, motions to strike are generally disfavored. In light of the Court's decision on Muylle's Motion for Turnover, WNC's Motion to Strike Omnibus Filing (Filing No. 629) is **DENIED**.

### IV. CONCLUSION

Christopher Muylle's Motion for Turnover of Trademarks (and for any Funds Received as Royalties Since the Purported Transfer) (Filing No. 620) is **DENIED without prejudice**. WNC's Motion to Strike or Disregard Unsupported Factual Assertions, Legal Conclusions and/or Other Irrelevant, Scandalous and/or Harassing Allegations (Filing No. 627) is **DENIED**. WNC's Motion to Strike Omnibus Filing (ECF 628), for Admonishment of Muylle and Counsel; and, Alternatively, for Extension of Time filed by WNC (Filing No. 629) is **DENIED**.

    **SO ORDERED**.

Date: 7/7/2017

_Tanya Walton Pratt_
TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

P. Adam Davis
DAVIS & SARBINOFF, LLC
adavis@d-slaw.com

Ronald J. Waicukauski
PRICE WAICUKAUSKI & RILEY, LLC
rwaicukauski@price-law.com

Carol Nemeth Joven
PRICE WAICUKAUSKI & RILEY, LLC
cnemeth@price-law.com